GROVER L. COVINGTON, Chief Judge.
This proceeding was instituted by petition of the District Attorney seeking to have Howard Rudolph, III, and Alan Rudolph, minor, twin children about IV2 years of age, adjudicated “children in need of care.”
The Department of Health and Human Resources initiated an investigation after receipt of a report or complaint from a reliable reporter that the children were being physically abused and neglected by their parents, Linda Rudolph and Howard Rudolph, Jr. As a result of investigation, the Department requested and was granted an instanter order placing temporary custody of the children in the Department. Subsequent to a continued custody hearing, the trial court maintained custody in the Department, and confirmed the instanter order placing said children into custody of the Department.
Following an adjudication hearing, at which the Department was represented by the office of the District Attorney, the minor children were represented by the Public Defender’s Office and the parents were represented by counsel of their own choosing, the trial court ordered “said children be placed in the legal and physical custody of the Department of Health and Human Resources, pursuant to Federal and State regulations.”
The parents have appealed, assigning as error:
1. Whether the State of Louisiana proved, by a preponderance of the evidence, reasonable grounds to believe that the minor children were children in need of care where none of the allegations of the verified complaint were substantiated at the hearing to determine continued custody-
2. Whether a statement, in and of itself, made by a parent, without any physical abuse or neglect, but made for the purpose of disciplining minor children, is sufficient to give rise to a determination that the children are children in need of care, abused and/or neglected children, at the conclusion of an adjudication hearing.
3. Whether a search warrant, showing probable cause, supported by an affidavit should have been required by the State before a search of the premises was made.
La.R.S. 14:403 is designed for the protection of children who are subject to abuse and neglect within the meaning of parts B(3) and (4) of the provision, which provided at the time as follows:
B. For the purpose of this Section, the following terms shall mean:
(3) ‘Abuse’ is the infliction, by a person responsible for the child’s care, of physical or mental injury or the causing of the *708 deterioration of a child including but not limited to such means as sexual abuse, sexual exploitation, or the exploitation or overwork of a child to such an extent that his health or moral or emotional well-being is endangered.
(4) ‘Neglect’ is the failure, by a person responsible for the child’s care, to provide the proper or necessary support, education as required by law, or medical, surgical, or any other care necessary for his well-being. No child who is being provided treatment in accordance with a recognized religious method of healing in lieu of medical treatment shall for that reason alone be considered to be neglected or abused...
In his opinion, the trial judge said:
[Tjhere seems to be some conflict among the testimony of the witnesses. Of course the Court must take the approach there that it should reconcile the conflicting evidence, if possible, not attribute falsity to anyone but see if it can resolve the evidence in such a manner in which all people who testified are testifying truthfully. I have no reason to disbelieve Mrs. Lawrence, Mrs. Woodward, Mrs. Brown, who are the lay witnesses of the State. I have no reason to disbelieve Miss James, Miss Curtin, Miss Brenda Brown. (There were two Browns, a Mary Brown, testified for the State and Miss Brenda Brown testified for the Rudolphs.) They are substantial, well-meaning people and about the only way I can reconcile all of that evidence is on the basis of something that Miss Brenda Brown said. She wasn’t with the Rudolphs’ twenty-four hours a day, so what they [the Rudolphs’ witnesses] saw may have been correct at the time they observed it, and on the other hand, what Mrs. Lawrence, Mrs. Woodward, and Mrs. Mary Brown observed, may very well have been absolutely and completely correct at the time they observed it. I am satisfied that all the parties in this proceeding were testifying to the best of their ability to the truth. So that resolved itself down to the issue, does the evidence reflect that these children are in need of care. Let’s go back to March the 18th. The kitchen incident, I will call it, where the extreme mess was found in the kitchen. Mrs. Rudolph apparently became so distraught and so upset, that she was very fearful that she would lose absolute and complete control and harm those children. I’m satisfied of that. And before she finally lost control and did something which she felt as though she would regret, she made an urgent call to Mrs. Lawrence, asking her to please come over. When Mrs. Lawrence arrived, Mrs. Rudolph was crying; the children had created a mess all over the house, had scattered food, sand, sugar all over the house. The boys were running around unsupervised. Shelves were up side down. Soiled diapers had been on them for such a prolonged period of time, that they had a horrible odor. Mrs. Rudolph said that she could not take care of those children. In Mrs. Lawrence’s opinion, Mrs. Rudolph was out of control. She was upset.... The children were filthy. Mrs. Lawrence called Mrs. Woodward for aid and assistance. Mrs. Rudolph agreed to this. She [Mrs. Woodward] agreed to keep these children until Mrs. Rudolph could calm herself down. The children were then taken to Mrs. Woodward’s home in Port Allen. Testimony was that they were filthy. They smelled so bad in the car that the witness had to roll the window down. Mrs. Woodward undertook to clean up these children and took three baths before they were even .moderately clean. Later that day, at the request of Mrs. Rudolph, Mrs. Woodward returned the children to her.
Mrs. Lawrence testified on other occasions when she had been in the [Rudolph] home. She testified that on almost every occasion, the house was always cluttered, never clean, the children’s toys were on the floor, dirty diapers and junk all around. The rooms were not clean, the toys were dirty. On March 5th, she brought diapers because they had none. One child was eating off the floor. One child had a rock in his mouth. Mrs. Rudolph said that the child put rocks in *709 his mouth all the time. Rocks that were larger than a marble. The child was extremely dirty. It was also brought out Mrs. Rudolph had stated that she was contemplating packing the car up with the children on a mattress and driving to New Hampshire, that she would not notify the New Hampshire authorities that she was there because it might create a problem with the Child Protection Agency there_ Mrs. Rudolph said to her on March 19th, ‘I didn’t hurt them but I will if, ...’ (not completing the sentence). Parenthetically, it might be noted that Mrs. Rudolph somewhat corroborated her [Mrs. Lawrence’s] testimony in that respect. I believe she [Mrs. Rudolph] wasn’t sure herself whether she would go so completely out of control, she might not harm these children. Mrs. Woodward’s testimony was that when she received the children, they had no shoes, they were filthy, the smell was unbearable. She gave them three baths, and gagged the whole time. She spoke to Mrs. Rudolph over the telephone. Mrs. Rudolph said she wanted to kill the children. Mrs. Woodward offered to keep the children overnight, but Mrs. Rudolph insisted on their return. She [Mrs. Woodward] called about six thirty PM because of the great deal of concern over the children and again the next morning and agreed to visit the children on Friday. While talking on the telephone, she heard a hit and a scream: Mrs. Rudolph saying ‘that’s what you get when you don’t mind.’ On Friday, when she [Mrs. Woodward] visited the [Rudolph] home, it was filthy, the chil-drens' room was a mess, there were cats in and out, the house reeked of urine, the children smelled the same as previously. Mr. Rudolph was not present in the home that day. According to her [Mrs. Woodward], the children seemed to be fearful of Mrs. Rudolph. Mrs. Woodward did not consider Mrs. Rudolphs’ statement that she wanted to kill the children just as idle conversation. She felt as though there was reality involved in that remark. The testimony of Mrs. Woodward was corroborated, at least to some extent, by another witness, Mrs. Mary Brown. She [Mrs. Brown] visited Mrs. Woodward on the day that the children were brought to her. She came over to help baby-sit the children. She said the children still had a terrible smell, even though she was told that they had already been bathed twice. They were again bathed after she got there. That was her only contact with the children. Mrs. Woodward also noticed marks on the children. These children, according to the testimony of Mrs. Lawrence and Mrs. Woodward, had been neglected and were not being properly cared for, at least on the occasion when they saw them. Mrs. Rudolph, as I have mentioned, almost ... she got out of control to such an extent that she was fearful that she would hurt her own children. Fortunately, she called Mrs. Lawrence. She hadn’t really — she seems to have vague recollection when something of this nature occurs in her life. She indicated that she may have, on occasion, had blackouts, but hadn’t had any in some time. She admitted that she felt overwhelmed on the March 18th incident. She thought she might hurt the children, according to her testimony. Mrs. Lawrence came over. She [Mrs. Rudolph] said when she got frustrated or mad, she doesn’t always remember what she does and so we have a situation here where Mrs. Rudolph, in fact, admits that she cannot recall what she may do, in episodes — during episodes of anger, and as I said previously, the Court does not give any effect to the psychological tests as to the children’s developmental and evaluation by Mr. Tuton or by Miss Mary Arthur Johnson, the Bayley test and the psychological test. You don’t take children away from parents just because somebody else might be able to stimulate them intellectually a little more. But you do move to protect children when there is a serious threat to their safety by virtue of a parent who admittedly will go out of control to such an extent, when those children displease her, she may do harm to those children. Perhaps in due course, the psychologist, after appropri *710 ate examinations, could evaluate exactly what those risks might be, but in the absence of any such evidence at this time, the Court is of the conclusion that these children would be at risk in Mrs. Rudolph’s custody at this time. So, this Court does conclude that these children are in need of care. The Court, of course, cannot ignore the fact and perhaps it is somewhat corroborative of the Court’s conclusion, that Mrs. Rudolph has had children removed from her custody in the State of Massachusetts, New Hampshire, and Florida, and now Louisiana. To the extent that that is relevant, it is merely some corroboration of the action which the Court will take here. You don’t wait until children are seriously injured or killed before the State intervenes. Where there is a serious risk, based upon the evidence as presented, as to the lack of care, the Court is of the opinion, that the Court is required to intervene in an appropriate case. The Court is of the opinion that this is an appropriate case. The Court further finds that the State, based on the Court’s evaluation of all the evidence here, has proved it’s case by a preponderance of clear and convincing evidence. The Court will therefore adjudicate these children to be in need of care. (Emphasis added.)
Appellants argue that the state failed to meet its burden of proof to show that these two minor children were “children in need of care,” within the meaning of the law.
There is no merit to this argument. We have fully set out above the trial judge’s appraisal of the evidence. We find that the record fully supports the conclusion and finding of the trial judge in this regard. We see no basis upon which it could be determined that the trier of fact was clearly wrong — manifestly erroneous in his factual conclusions, and we agree that, based on these facts, these children were in need of care within the purview of La.R.S. 14:403 and La.C.J.P. art. 13(14). La. C.J.P. art. 13(14)(b).
Appellants also contend that the trial judge erroneously relied on statements or alleged threats made by the children’s mother rather than on evidence of abuse or neglect. They argue that: “A threat to the welfare of the child is not a basis for an adjudication against the parent unless the parent has refused or neglected to supply the child with necessary food, clothing, shelter, medical care, counseling or education or as a result of the parent’s neglect or imposition of cruel punishment.”
The opinion of the trial judge, as expressed above, and the record as a whole, in no way suggest that Judge Moseley relied on mere statements of a parent or a mere threat to the children’s welfare as a basis for his decision to place custody of these children in the Department. The basis for his decision was that these children were neglected by their parents and that “these children would be at risk in Mrs. Rudolph’s custody at this time.” The totality of the evidence shows that these children come within the protection of the law as “neglected children.” See La.R.S. 14:403(B)(4); La. C.J.P. art. 13(14); State in Interest of Quitter, 424 So.2d 394 (La. App. 2 Cir.1982).
The argument relating to the need of a search warrant is specious. The evidence does not show that the State or the Department made any attempt to search the residence of the Rudolphs. All actions were taken pursuant to the Code of Juvenile Procedure and the appropriate statutes for the protection of children.
For the foregoing reasons, we conclude that the findings of the trial court are supported by the evidence and bring these children within the purview of the statutory definition of a “neglected child.” The judgment is affirmed at appellant’s costs.
AFFIRMED.